W. R. ROYSTER AND MINNIE M. ROYSTER, ET AL., Petitioners, [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent Royster v. Commissioner
Docket Nos. 2366-79, 2367-79, 2368-79.
United States Tax Court
T.C. Memo 1985-258; 1985 Tax Ct. Memo LEXIS 377; 49 T.C.M. (CCH) 1594; T.C.M. (RIA) 85258; May 29, 1985. Carl D. Dawson, Joseph E. Warren, for the petitioners. Avery B. Cousins, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Taxable Year
Addition to Tax
Petitioners
Ended
Deficiency
Sec. 6653(a) [2]
W. R. Royster &
12/31/69
$138,922.78
$6,946.14
Minnie M. Royster
12/31/70
71,604.63
3,580.23
12/31/71
131,667.24
6,583.36
12/31/72
181,037.48
9,051.87
12/31/73
71,490.87
3,574.54
12/31/74
127,058.17
6,352.91
John E. Royster &
12/31/72
2,666.00
133.00
Faith S. Royster
12/31/73
6,096.00
305.00
12/31/74
17,862.00
893.00
Dan Earl Royster &
12/31/72
2,592.00
130.00
Dale T. Royster [3]
12/31/73
866.00
43.00
12/31/74
20,307.00
1,015.00
*381 After concessions [4] the issues for decision are: (1) Whether certain sales of real estate reported by John E. Royster ("John") and Dan Earl Royster ("Dan") on their Federal income tax returns for the years 1969 through 1974 should be imputed to W. R. Royster ("W.R.") and Minnie M. Royster ("Minnie"). (2) Whether interest on the installment obligations attributable to these sales should be imputed to W.R. and Minnie. (3) Whether W.R. and Minnie may make an installment sale election for sales imputed to them. (4) Whether W.R. and Minnie must recognize gain from the sale of real estate described as Paradise View Estates Addition No. 3 in all of the years at issue. (5) Whether *382 respondent correctly determined the basis for gain on sales of real estate not reported on W.R. and Minnie's Federal income tax returns for the years at issue. (6) Whether W.R. must recognize ordinary income on sales of real estate made by him during the years at issue. (7) Whether W.R. paid compensation to John and Dan in the years 1969 through 1974. (8) Whether petitioners are liable for self employment taxes under section 1401 attributable to income earned by W.R., John and Dan in the amounts determined by respondent for each of the years at issue. (9) Whether interest income attributable to certificates of deposit held in the names of W.R. and Minnie and other members of the Royster family should be reported by W.R. and Minnie. (10) Whether petitioners are entitled to the full amount of charitable contribution deductions claimed for contributions of real estate. (11) Whether petitioners are subject to the addition to the tax under section 6653(a) for each of the years at issue. (12) Whether W.R. and Minnie are entitled to use the income averaging provisions of sections 1301 through 1305 for each of the taxable years at issue. (13) If we do not sustain respondent's *383 determination in the issue raised in (1) above, whether John and Dan must recognize ordinary income from sale of real estate reported on their Federal income tax returns for the years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this *384 reference. W.R. and Minnie resided in Bascom, Florida, when they filed their petition in this case. John and his wife Faith S. Royster ("Faith") resided in High Springs, Florida, when they filed their petition in this case. Dan and his wife Dale T. Royster ("Dale") resided in Dunnellon, Florida, when they filed their petition in this case.The notices of deficiency were issued to petitioners on November 22, 1978. W.R. was born on September 19, 1916, and married Minnie in 1938. Neither W.R. nor Minnie were formally educated beyond the tenth grade. Ralph born in 1939, John born in 1945 and Dan born in 1947 are three of W.R. and Minnie's four children. Prior to 1947 W.R. was engaged in farming. In 1947 W.R. sold his farm, and the Royster family travelled for several years. The Royster family moved to Sebring, Florida, in 1954. Shortly after they moved to Sebring, W.R. and Minnie began to purchase parcels of real estate. In succeeding years W.R. and Minnie continued to purchase large tracts of real estate and make sales of this real estate. In the years 1955 through 1973, W.R. and Minnie reported 40 sales of both improved and unimproved real estate on their Federal income tax *385 returns. As of 1971 W.R. and Minnie owned approximately 100 subdivision properties in Florida and had made sales of or given options to purchase at least 18 separate subdivision properties, including four properties which were at the time purportedly owned by John and Dan. Some of the properties had been subdivided by W.R. as a result of concern about a stringent zoning law which was to be passed in Putnam County, Florida. W.R. subdivided his property prior to enactment of the new zoning law in order to retain the value of his real estate. The records of Putnam County show that W.R. and Minnie platted approximately 38 subdivisions of between 400 and 600 lots in 1960. W.R. maintained an office for his real estate activities. W.R. also conducted real estate activities "out of the trunk of his car." Although some advertising was done, generally prospective purchasers learned of the property without advertising by W.R. other than site signs. W.R. was never licensed to sell real estate. On the Federal income tax returns filed by W.R. and Minnie for the years 1969 through 1974, W.R.'s occupation was listed as "investments" in 1969 and 1970, no occupation was listed in 1971 or 1972 *386 and W.R.'s occupation was listed as "retired" in 1973 and 1974. Minnie's occupation was listed as "housewife" in 1969 and 1970, no occupation was listed in 1971 or 1972 and Minnie's occupation was listed as "retired" in 1973 and 1974. However, in each year W.R. and Minnie claimed nonbusiness expenses and in 1971, 1972 and 1974 they claimed employee business expenses. [5] W.R. and Minnie listed their present home address as Box 201, Interlachen, Florida, on their returns for the years 1970 through 1973. The expenses reported by W.R. and Minnie for the years 1969 through 1974 included the following: [6]
1969
1970
1971
1972
1973
1974
Gas & Oil
$1,442.35
$1,005
$1,640
969
916
$920
Insurance
175.95
192
472
205
251
273
Parts &
423.33
450
814
527
578
191
Repair
Telephone
329.59
383
648
671
581
Electricity
148.08
116
117
118
50
102
Travel, Meals
547.31
562
314
314
423
439
& Lodging
Office Expense
134.70
67
83
223
9
665
Postage
31.06
36
162
1
41
Parking &
50.00
85
80
100
100
Tolls
Depreciation
1,223.09
1,624
1,155
1,314
1,907
1,905
*387 The income reported on their returns was predominantly attributable to sales of real estate. The only additional source of income reported on their returns during these years was interest income. All sales of real estate were reported as sales of property held for investment. In the years 1955 through 1968 W.R. and Minnie's income as reported on their Federal income tax returns was also predominantly attributable to sale of real estate. W.R. was aware that systematic sales of real estate could result in his being treated as a dealer in real property for Federal income tax purposes. As W.R. and Minnie's sons matured, they also became involved in activities related to real estate sales and development. Ralph bacame involved in real estate development and construction. By the time John was 12 and Dan was 10, they were assisting Ralph in his business. Initially, John and Dan were merely "picking up roots," but by the time Dan was 16 he and John were operating construction and development equipment for Ralph. John and Dan anticipated becoming involved in real estate development and construction after they graduated *388 from high school. Both John and Dan sought and were granted removal of disabilities of nonage when they reached the age of 18 permitting them to transact business as adults. During each of the years 1969 through 1974 John and Dan were engaged in real estate related activities including construction and development. At least a portion of their activities were performed on the real estate owned by W.R. and Minnie. A substantial amount of the gross income which John and Dan reported for each of these years was attributable to cash proceeds from sales of real estate. W.R. and Minnie actively participated in the sales reported by John and Dan. W.R. and Minnie dealt with prospective purchasers and made out some of the agreements and deeds. W.R. placed signs on one of the properties directing prospective purchasers to inquire of him as to sales of the property. In addition Minnie wrote correspondence relating to payments on the properties, maintained records and deposited payment checks. On sales of subdivision lots purchasers were directed to mail payment checks to Box 201, Interlachen, Florida. For a period of 13 months between August 29, 1972, and October 11, 1973, some or all *389 of these checks were deposited in a joint checking account in the names of W.R. or Minnie or John or Dan at Dothan Bank and Trust, Dothan, Alabama. W.R. and Minnie were the only signatories of checks drawn on the account, and checks were issued to John and Dan in the amounts of $4,383.00 and $5,469.86, respectively, in 1972 and $24,878.83 and $17,998.83, respectively, in 1973. In each of the years 1969 through 1974 the adjusted gross income reported on the Federal income tax returns of John and Dan was substantially less than the adjusted gross income reported on the Federal income tax returns of W.R. and Minnie. In all of the years at issue, the Federal income tax returns for petitioners were prepared by an accountant. In most of the years at issue, Glenn Stephens prepared the Federal income tax returns for petitioners using information supplied by W.R. The primary issues in this case involve the treatment of certain real estate transactions reported on the Federal income tax returns of petitioners. The history of these transactions span many years and involve numerous sales, repossessions and resales. As relevant to the issues herein, the history of each real estate transaction *390 is as follows: Silver Lake Estates
The property later described as Silver Lake Estates was acquired by W.R. and Minnie by warranty deed dated December 8, 1955. [7] Silver Lake Estates encompassed approximately 100 acres of land. The florida documentary stamps affixed to the warranty deed indicate that the total consideration was $7,500. [8]
By contract for sale dated July 2, 1960, W.R. and Minnie agreed to sell Silver Lake Estates to Silver Lake Estates, Inc. The total purchase price for the property was $100,010. Ralph Colletti ("Colletti") executed the agreement as president of Silver Lake Estates, Inc. The real estate was conveyed to Silver Lake Estates, Inc., by warranty deed dated August 5, 1960. *391 A mortgage deed dated August 5, 1960, was also executed. The mortgage deed secured an installment, promissory note which provided, in part, that no principal payments were required to be made on the mortgage and that the only reduction of principal would be voluntary payments or payments made to obtain a release of the mortgage lien on portions of the property. This transaction was reported as a sale under the installment method on W.R. and Minnie's Federal income tax return for 1960. The selling price was reported as $100,000. A plat of Silver Lake Estates was made by Silver Lake Estates, Inc. Silver Lake Estates, Inc., reconveyed all of the Silver Lake Estates real estate subject to the original transfer to W.R. and Minnie by warranty deed dated June 30, 1961. This deed was executed in lieu of foreclosure, and W.R. and Minnie subsequently recorded a satisfaction of mortgage for the debt on April 27, 1962. The Florida documentary stamps affixed to the warranty deed indicate consideration for the transfer of $100 or less. W.R. and Minnie reported $800 cash proceeds from the sale of the property to Silver Lake Estates, Inc., on their Federal income tax return for 1960, but *392 eliminated the amount reported as a gain by an amended Federal income tax return for the same year. W. R. and Minnie did not otherwise report the cash proceeds as income in 1960. By agreement dated January 17, 1962, W. R. and Minnie granted D. M. Eiler ("Eiler") an option to purchase Silver Lake Estates for a purchase price of $158,750. Eiler did not exercise this option and by warranty deed dated July 5, 1966, W. R. and Minnie conveyed all of Silver Lake Estates, except the west 225 feet of lot 110, to John and Dan. The warranty deed was recorded an December 14, 1966, with Florida documentary stamps affixed indicating consideration of $100 or less. By warranty deed dated July 6, 1966, W. R. and Minnie conveyed the west 225 feet of lot 110 to the First Church of God, Frankfort, Kentucky. Both the transfer to John and Dan and the contribution to the First Church of God were reported on W. R. and Minnie's Federal income tax return for 1966. The selling price for the property conveyed to John and Dan was reported as $50,000 on the Federal income tax return. This amount was reduced by "Cost and Selling Expense" in the amount of $25,000. The gain was reported as long term capital *393 gain under the installment method. In the years 1966 through 1971, W. R. and Minnie reported total installments received from John and Dan in the amount of $50,000 on their Federal income tax returns. After transfer of legal title to John and Dan, existing improvements were repaired and a beach was constructed by John and Dan. Lots at Silver Lake Estates were sold by agreements for deed. The agreements for deed provided that the purchaser would make a small down payment and make monthly payments of principal and interest until the principal amount was fully amortized at which time a warranty deed would be given to the purchaser. John and Dan were listed as sellers on the agreements for deed, and all payments were to be made to them. On the agreements for deed executed prior to 1972, payments were to be mailed to John and Dan at "Box 201, Interlachen, Florida." The agreements for deed further provided, in part, that no fense or wall was to be built on the property without the approval of John or Dan. The property was advertised in local newspapers. Although John and Dan were listed as the sellers on the agreements for deed and all payments were to be made to them, W. R. negotiated *394 at least one sale at Silver Lake Estates. John and Dan Reported the sales of property at Silver Lake Estates on their Federal income tax returns. John and Dan conveyed enumerated lots at Silver Lake Estates to Warner Southern College of Lake Wales, Florida, by warranty deed dated August 10, 1970. The Florida documentary stamps affixed to the deed indicate consideration of $100 or less. John and Dan claimed a charitable constribution deduction for the conveyance of this real estate on their Federal income tax returns for 1970. In each instance the charitable contribution deduction was limited, and the excess amount over the limitation was claimed as a contribution carry over in 1971. John and Dan transferred additional lots at Silver Lake Estates to Warner Southern College by warranty deed dated January 7, 1971. The Florida documentary stamps affixed to the warranty deed indicate consideration of $100 or less. W. R. and Minnie reported the full fair market value of the Silver Lake Estates real estate conveyed in 1971, computed as $22,500, as a charitable contribution on their Federal income tax return for 1971. John and Dan also claimed a charitable contribution deduction *395 for the conveyance of this real estate on their Federal income tax returns for 1971. The fair market value of the real estate reported on John and Dan's returns was $11,250. In each instance the charitable contribution deduction was limited, and the excess amount over the limitation was claimed as a contribution carry over in 1972. Cooper Lake Hills
The property later described as Cooper Lake Hills was acquired by W. R. and Minnie by three warranty deeds, each dated in April of 1959. [9] The Florida documentary stamps affixed to the warranty deeds indicate the total consideration was $10,600. By warranty deed dated August 10, 1959, W. R. and Minnie conveyed the real estate to Eugene Denes and his wife ("Denes"). The Florida documentary stamps affixed to the warranty deed indicate that the consideration was $39,500. Denes executed a mortgage deed securing an installment, promissory note in the principal amount of $37,000, and a subordinated mortgage deed securing an installment, promissory note in the amount of $11,000. The notes were to be paid in biannual installments beginning six months from the date of July 27, 1959. *396 The mortgage deeds provided, in part, that after subdivision individual lots could be released from the mortgage lien on payment of a specified amount. A plat of Cooper Lake Hills dated August 26, 1959, was made by Denes, and some of the lots in the subdivision were subsequently released pursuant to the terms of the mortgage deeds. The sale of Cooper Lake Hills to Denes was reported under the installment method on W. R. and Minnie's Federal income tax return for 1959. The selling price was reported as $40,500. W. R. and Minnie reported collection of total cash proceeds in the amount of $5,075 on their Federal income tax returns for 1959 through 1961. Denes reconveyed the remaining Cooper Lake Hills real estate subject to the mortgage deeds to W. R. and Minnie by warranty deed dated March 1, 1961. The Florida documentary stamps affixed to the warranty deed indicate consideration of $100 or less. On March 3, 1961, W. R. and Minnie executed two satisfaction of mortgages cancelling Denes' mortgages. W. R. and Minnie reported a gain on repossession of the Cooper Lake Hills property in the amount of $11,467.95 on their Federal income tax return for 1961. By warranty deed dated *397 June 1, 1963, W. R. and Minnie conveyed a portion of the Cooper Lake Hills real estate which they had received from Denes to George W. Blackwell and his wife ("Blackwell") and W. D. Carr and his wife ("Carr"). The Florida documentary stamps affixed to the warranty deed indicate consideration of $32,300. Blackwell and Carr executed a mortgage deed securing an installment, promissory note in the amount of $32,300. The note was to be paid in monthly installments of $50 plus interest with the first payment due on October 1, 1963. The mortgage deed provided, in part, that individual lots could be released on the payment of a specified amount. Some of the lots were so released pursuant to the terms of the mortgage deed on the payment of $3,460. Blackwell and Carr transferred legal title to the property to John and Dan by warranty deed dated April 5, 1967. The Florida documentary stamps affixed to the warranty deed indicate consideration of $100 or less. The deed recites "[t]his deed is made for the purpose of vesting title in D. E. Royster and J. E. Royster with no monetary consideration." W. R. and Minnie recorded a satisfaction of the mortgage on December 27, 1972. W. R. and *398 Minnie reported no income from the sale to Blackwell and Carr on their Federal income tax returns for the years 1963 through 1967. After transfer of legal title to John and Dan, existing improvements were repaired by John and Dan, and lots at Cooper Lake Hills were sold by agreements for deed. The agreements for deed provided that the purchaser would make a small down payment and make monthly payments of principal and interest until the principal amount was fully amortized at which time a warranty deed would be given to the purchaser. John and Dan were listed as sellers on the agreements for deed, and all payments were to be made to them. Payments were to be mailed to John and Dan at "Box 201, Interlachen, Florida." John and Dan reported the sales of property at Cooper Lake Hills on their Federal income tax returns. John and Dan conveyed enumerated lots in Cooper Lake Hills to Warner Southern College by warranty deed dated November 4, 1969. The Florida documentary stamps affixed to the warranty deed indicate consideration of $100 or less. The warranty deed recited "[t]his instrument prepared by W. R. Royster.c The fair market value of the property was $10,000. The full fair *399 market value of $10,000 was reported as a charitable contribution on W. R. and Minnie's Federal income tax return for 1969. The charitable contribution was limited, and the excess amount over the limitation was claimed as a contribution carry over in 1970. Neither John nor Dan reported the conveyance as a charitable contribution in 1969. John and Dan conveyed additional lots in Cooper Lake Hills to Warner Southern College by warranty deed dated April 17, 1970. The warranty deed recited "[t]his instrument prepared by W. R. Royster." The Florida documentary stamps affixed to the deed indicate consideration of $100 or less. W. R. and Minnie reported the fair market value of the Cooper Lake Hills real estate conveyed in 1970 as a charitable contribution on their Federal income tax return for 1970. The charitable contribution deduction was limited, and the excess amount over the limitation was claimed as a contribution carry over in 1971. The 1970 conveyance of the Cooper Lake Hills property to Warner Southern College was pursuant to negotiations entered into by W. R. The parties agreed that W. R. would make a bargain sale to Warner Southern College. Warner Southern College *400 paid $200 per lot purchased. Pursuant to W. R.'s direction Warner Southern College paid for the property by four checks in the total amount of $13,800 in 1970, 1971 and 1972. Although the checks were payable to John and Dan, W. R. presented two checks in the amount of $9,200 for collection. On August 30, 1971, W. R. issued a receipt to Warner Southern College showing that full payment had been received for 19 lots. W. R. and Minnie did not report a gain or loss from the bargain sale to Warner Southern College on their Federal income tax returns for the years 1970 through 1972. John and Dan did report the conveyance as an installment sale on their Federal income tax returns for the years 1970 through 1972. Rainbow Lake Estates
The property later described as Rainbow Lake Estates was acquired by W. R. and Minnie by two warranty deeds, one dated March 6, 1957, and the other dated February 28, 1959. [10] The Florida documentary stamps affixed to each deed indicate consideration of $7,900 and $1,900, respectively. [11]
*401 A plat of Rainbow Lake Estates dated September 20, 1961, was made by W. R. and Minnie. By agreement dated January 17, 1962, W. R. and Minnie granted Eiler and option to purchase Rainbow Lake Estates for a purchase price of $53,975 with a downpayment of $4,250. The option price was $1,000 for a one-year option on Rainbow Lake Estates and nine other tracts of real estate. Eiler was to pay an additional $100 annually to maintain the option for Rainbow Lake Estates. Eiler exercised the option to purchase Rainbow Lake Estates as president of Peninsula Securities Co., Inc. Peninsula Securities Co., Inc. executed a mortgage deed dated March 16, 1963, securing a promissory note in the amount of $24,862.50. The promissory note was payable in full on or before five years from March 16, 1963. The mortgage deed provided that the mortgage lien on individual lots would be released on the payment of a specified amount. This transaction and another sale of real estate to Eiler were reported as an installment sale on W. R. and Minnie's Federal income tax return for 1963. The selling price of Rainbow Lake Estates was reported as $53,975. [12]
*402 Subsequently, Mr. Realty, Inc., successor to Peninsula Securities Co., Inc. conveyed all of Rainbow Lake Estates, less enumerated lots and blocks, to John by quit claim deed dated December 13, 1967. The Florida documentary stamps affixed to the quit claim deed indicate consideration of $100 or less. The deed recites "[t]his deed is made for the purpose of vesting title in J. E. Royster, a single person, with no monetary consideration." A satisfaction of mortgage was filed on June 29, 1971, by W. R. and Minnie as mortgagees. W. R. and Minnie reported total installments received on the sale of Rainbow Lake Estates and another property to Eiler in the amount of $10,500. W. R. and Minnie reported a gain from repossession of this property on their Federal income tax return for 1970. After transfer of legal title to John, John and Dan put in two streets and lots at Rainbow Lake Estates were sold by agreements for deed. The agreements for deed provided that the purchaser would make a small down payment and make monthly payments of principal and interest until the principal amount was full amortized at which time a warranty deed would be given to the purchaser. John was listed as *403 the seller on the agreements for deed and all payments were to be made to him. Payments were to be mailed to John at "Box 201, Interlachen, Florida." The Rainbow Lake Estates property was advertised in local papers, and in at least one instance W. R. negotiated for the sale of the lots. John and Dan reported the sales of lots at Rainbow Lake Estates on their Federal income tax returns. By agreement dated May 22, 1970, W. R. and Minnie granted an option to purchase 443 lots at Rainbow Lake Estates to Colletti. In consideration of the option to purchase Rainbow Lake Estates and 13 other subdivisions, Colletti paid $1,000 for a three month option. Additional extensions of the option were available upon the payment of $1,000 for a three month extension and thereafter $500 annually per unpurchased subdivision for an additional extension. The agreement provided that the purchase price for each lot would be $200. The agreement further provided, in part, that: VII. CONVENANTS AND WARRANTIES OF [W. R. and Minnie]
(a) Abstract: [W. R. and Minnie] agrees to deliver * * * a complete set of abstract or abstracts of title covering the subject property * * * which Abstract *404 shall show title in [W. R. and Minnie] to be good, marketable and insurable. * * * (f) All cash deposits and any other sums heretofore mentioned required to close or to release any lots from an existing mortgage shall be tendered to [W. R. or Minnie] * * * (g) That [W. R. and Minnie are] the legal title owners of all property described above and that [they have] the right to execute this Agreement. * * * (j) That all street[s], as they affect each subdivision are properly graded and marked and will be tendered by [W. R. and Minnie] in good condition at closing of each Subdivision at [their] expense. That the shoulders of each street will also be maintained by [W. R. and Minnie] clean and cut at closing of each Subdivision at [their] expense. (k) That [W. R. and Minnie] will join COLLETTI in any additional platting, replatting and/or dedication for right of way and easements, and that if [W. R. and Minnie] defaults or fails to comply with any covenant, promise, warranty or condition as contained in this contract, all interest due or to become due under the terms of any then existing note executed by COLLETTI in favor of [W. R. and Minnie] shall cease *405 and any principal payments due or to become due shall be stayed until [W. R. and Minnie have] compiled [sic] and cured any such defects or breach. The agreement was signed by W. R. and Minnie. The agreement was not signed by either John or Dan. By agreement dated March 1, 1971, Colletti agreed to purchase 447 lots at Rainbow Lake Estates from W. R. and Minnie for $200 per lot. W. R. and Minnie signed the agreement as sellers. The agreement was not signed by John or Dan. The agreement stated that the total price for the lots at Rainbow Lake Estates would be $89,400 with a downpayment of $1,000 and a mortgage of $88,400. W. R. and Minnie granted Coletti an additional three year option to purchase the lots at Rainbow Lake Estates by memorandum agreement dated May 1, 1971. By warranty deed dated July 3, 1971, John conveyed the Rainbow Lake Estates lots subject to the option agreements between W. R. and Minnie and Colletti to Paradise Investment Corp., Colletti's wholly owned corporation. The Florida documentary stamps affixed to the warranty deed indicate that the total consideration was $134,100. Paradise Investment Corp. executed a mortgage deed dated July 6, 1971, showing *406 W. R. and Minnie as mortgagees. The mortgage secured an installment promissory note relating to the sale of the Rainbow Lake Estates lots and six other subdivisions. The promissory note was payable to W. R. and Minnie. The mortgage provided that the mortgage lien on individual lots would be released on payment of $300 per lot. [13] An additional agreement was executed by Colletti and his wife and W. R. and Minnie which permitted Colletti and his wife to make payments on behalf of Paradise Investment Corp.
W. R. and Minnie reported no income from the sale of Rainbow Lake Estates of Paradise Investment Corp. on their Federal income tax returns for the years 1971 through 1974. John and Dan did report gain from the sale of Rainbow Lake Estates on their Federal *407 income tax returns for the years 1971, 1972 and 1974. The sale was reported as a long term capital gain under the installment method, and the selling price was reported as $89,400. Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores
The properties later described as Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores were acquired by W. R. and Minnie by warranty deed dated February 21, 1956. [14] The purchase price of the property was approximately $16.00 per acre for 1340 acres. Plats of Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores were made by W. R. and Minnie and recorded in September of 1961. By agreement dated May 22, 1970, W. R. and Minnie granted an option to purchase 205 lots at Orange Blossom Manor, 412 lots at Lake Lucy Estates and 438 lots at Lake Lucy Shores to Colletti. These options were part of the agreement W. R. and Minnie executed with respect to Rainbow Lake Estates. Colletti did not exercise his option to purchase any of the lots at Orange *408 Blossom Manor, Lake Lucy Estates or Lake Lucy Shores. In February of 1971 W. R. and Minnie filed a petition for writ of mandamus relating to Orange Blossom Manor. The petition was filed in response to an increase in the assessed value of the property. In the petition W. R. and Minnie stated, in part: 1. That the Petitioners [W. R. and Minnie] were and are still the owners of the following lands in Putnam County, Florida, to-wit: All of Orange Blossom Manor * * * except Block 1; Lots 17 to 44 inclusive of Block 2; Blocks 7, 8, 9, 10 and E 1/2 of Block 6. On May 1, 1971, W. R. and Minnie granted a three year option to purchase 205 lots at Orange Blossom Manor, 412 lots at Lake Lucy Estates and 438 lots at Lake Lucy Shores to Anthony S. Caserta ("Caserta"). By warranty deed dated May 2, 1972, W. R. and Minnie conveyed lots in Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores and one other property to Caserta. The Florida documentary stamps affixed to the warranty deed indicate that total consideration for the lots conveyed in the four subdivisions was $328,400. Caserta executed three mortgage deeds dated May 2, 1972, relating to Orange Blossom Manor, Lake Lucy *409 Estates and Lake Lucy Shores. The mortgage deeds secured installment, promissory notes in the amounts of $40,000, $81,400 and $86,600, respectively. Each note was to be paid in annual installments of one-seventeenth of the principal amount commencing on May 1, 1974. Individual lots would be released from the mortgage lien on the payment of $300 of the principal amount. W. R. and Minnie were the mortgagees on each mortgage deed and the payees on each note. W. R. and Minnie executed a satisfaction of mortgage dated January 24, 1974, cancelling the mortgage deed and note relating to Orange Blossom Manor and a satisfaction of mortgage dated March 12, 1974, cancelling the mortgage deed and note relating to Lake Lucy Estates. W. R. and Minnie reported no gain or loss from the sale of these properties to Caserta on their Federal income tax returns for the years 1972 through 1974. John and Dan did report gain from these sales on their Federal income tax returns for the years 1972 and 1974. Only John reported gain from the sales in 1973. The sales were reported as long term capital gains under the installment method, and the selling price reported as $211,000. Levy County Property
*410 Morris Chapman conveyed 640 acres of real estate in Levy County to John as assignee of the option held by W.R. by warranty deed dated June 17, 1964. The Florida documentary stamps affixed to the warranty deed indicate consideration of $55,500. By warranty deed dated July 15, 1964, John conveyed a one-half interest in the Levy County real estate to Dan. The Florida documentary stamps affixed to the warranty deed indicate consideration of $100 or less. John and Dan each built a personal residence on the property. In addition two acres of the property was paved, underground tanks installed and a boulevard was paved. In March of 1969 John and Dan agreed to convey a portion of the Levy County property to Sham G. Sani ("Sani"). The agreement specifically reserved to the sellers possession and use for one year of the two parcels on which John and Dan's personal residences were located. The total purchase price stated in the agreement was $180,000 of which $2,000 was a binder paid on execution of the agreement, $8,000 was cash to paid at closing and $170,000 was to be paid pursuant to the terms of a purchase money mortgage and promissory note.Monthly payments on the note in the *411 amount of $2,000 were to be made until the note was fully paid. Individual parcels would be released from the mortgage lien on the payment of specified amounts. Payments for release of the mortgage lien on the parcels on which John and Dan's personal residences were located were $35,000. The agreement further provided, in part, that the mortgagor would plat the property into subdivisions and that the subdivisions would substantially follow the plat for roads presently set out by the sellers. The agreement also provided that the purchase money mortgage and promissory note would be made payable one-half to W.R. and Minnie, one-quarter to John and one-quarter to Dan. Finally, the agreement provided that any notice required to be given to the seller may be given by mailing the notice to "c/o Mr. W.R. Royster, Interlachen, Florida." By warranty deeds dated May 16, 1969, John and Dan conveyed the Levy County property subject to the agreement to Oak Ridge Estates, Inc. of which Sani was a shareholder. Oak Ridge Estates, Inc. executed a mortgage deed securing a promissory note in the principal amount of $169,262. The Florida documentary stamps affixed to the warranty deeds indicate *412 total consideration of $180,000. The promissory note was payable at the residence of W.R. The payments were to be in eighteen monthly installments of $1,000 and thereafter in monthly installments of $1,500 until fully paid. W.R. and Minnie had a one-half interest, John a one-quarter interest and Dan a one-quarter interest. The mortgage provided that any plan of subdivision would follow the plan for roads as presently laid out by the mortgagees. By letter dated February 22, 1971, W.R. wrote to Oak Ridge Estates, Inc. informing it that specified roads had been completed and billing Oak Ridge estates, Inc. for the work. Payments were to be made to John and Dan. W.R. and Minnie reported no gain or loss from the sale of the Levy County property to Oak Ridge Estates, Inc. on their Federal tax returns for the years 1969 through 1974. John and Dan did report gain from this sale on their Federal income tax returns for the years 1969 through 1973. The sale was reported as a long term capital gain under the installment method, and the selling price listed as $180,000. Paradise View Estates Addition No. 3
The property, a portion of which was later described as Paradise View Estates *413 Addition No. 3, was purchased by W.R. and Minnie by warranty deed dated April 9, 1955. [15] The Florida documentary stamps affixed to the warranty deed indicate that the consideration for the property conveyed was $20,500. By agreement dated September 3, 1959, W.R. and Minnie agreed to convey Paradise View Estates Addition No. 3 and other real estate to Colletti. The total purchase price stated in the agreement was $112,000 of which $200 was to be paid with execution of the agreement, $4,800 was to be paid by September 10, 1959, and the balance of $107,000 was to be paid in semiannual installments of $2,000 commencing on March 10, 1960. The agreement also provided that all or a portion of the principal amount could be prepaid at any time. In addition the agreement provided that the mortgage deed to be executed by the purchaser would permit individual lots to be released from the mortgage lien on payment of specified amounts. W.R. and Minnie transferred the property subject to the agreement to Colletti by warranty deed *414 dated September 10, 1959. The Florida documentary stamps affixed to the warranty deed indicate that the purchase price for the property was $84,000. Colletti and his wife executed a mortgage deed and an installment, promissory note, both dated September 10, 1959, reflecting the terms of the agreement. A collateral agreement was executed which provided that enumerated provisions of the contract of sale remained in full force and effect notwithstanding the conveyance of the property. A plat of Paradise View Estates Addition No. 3 dated September 29, 1959, was recorded by Colletti and his wife. Colletti and his wife transferred the property acquired from W.R. and Minnie to Paradise View Estates, Inc. by warranty deed dated September 23, 1959. This transfer was subject to the mortgage in the amount of $107,000. By warranty deed dated August 5, 1960, Paradise View Company reconveyed the property to W.R. and Minnie. The reconveyance was pursuant to a modification agreement dated August 5, 1960, which provided that the mortgage balance outstanding on the property conveyed to Colletti would be reduced by $40,000. The Florida documentary stamps affixed to the warranty deed indicate *415 consideration of $100 or less. W.R. and Minnie reported this transaction as a sale or exchange in which $40,000 was the amount realized on their amended Federal income tax return for 1960. By warranty deed dated June 13, 1961, W.R. and Minnie conveyed Paradise View Estates Addition No. 3 and another property to Sunshine Angel Land Development, Inc. The Florida documentary stamps affixed to the warranty deed indicate consideration of $58,000. In 1964 W.R. foreclosed on the property, and the land was reconveyed to him. W.R. and Minnie reported no gain or loss attributable to this transaction on their Federal income tax returns for the years 1961 through 1964. W.R. and Minnie agreed to convey Paradise View Estates Addition No. 3 to John and Elsie Lackey ("Lackey") for $58,300 by agreement dated August 12, 1966. A warranty deed recorded on November 1, 1966, was executed by W.R. and Minnie conveying the property to Lackey. The Florida documentary stamps affixed to the deed indicate consideration of $24,000. Lackey paid approximately $22,000 of the purchase price. By warranty deed dated October 13, 1969, Lackey conveyed enumerated lots in Paradise View Estates Addition No. 3 *416 to Paradise View Estates, Inc. The Florida documentary stamps affixed to the warranty deed indicate consideration of $15,000. On October 14, 1969, Paradise View Estates, Inc. executed two purchase money mortgages relating to the Paradise View Estates Addition No. 3 lots conveyed to it by Lackey. The mortgages provided that individual lots would be released from the mortgage lien on the payment of specified amounts. The mortgage deeds each secured an installment note, one in the principal amount of $30,500 and the second in the amount of $15,000. Both notes provided that payments of $1,000 were to be made semi-annually commencing on October 14, 1970. A modification agreement dated September 16, 1970, was entered into by Paradise View Estates, Inc. and W.R. and Minnie to perfect the release clause in the original mortgage deed securing the promissory note in the amount of $15,000. A satisfaction of the mortgage dated October 10, 1974, securing the promissory note in the amount of $15,000 was executed by W.R. and Minnie. The satisfaction of the mortgage stated that the note had been paid in full. W.R. and Minnie reported no gain or loss attributable to payments on the property *417 made by Lackey or Paradise View Estates, Inc. on their Federal income tax returns for the years 1966 through 1974. Gilchrist County Property
In 1974 W.R. and Minnie transferred 100 acres of real estate in Gilchrist County, Florida, to the First Church of God of Ocala, Inc. ("First Church"), a not for profit corporation. Three weeks after the real estate was conveyed to the First Church, the First Church executed two warranty deeds conveying the Gilchrist County property to John and his brother Ralph. Both John and Ralph built personal residences on this property. All of the deeds were recorded on the same date. The purchase price paid by John and Ralph was a total of $20,000. W.R. and Minnie reported the full fair market value of the property, claimed to be $150,000, less one-half of the long term capital gain as a charitable contribution on their Federal income tax return for 1974. At the time of the conveyance from the First Church, Faith was secretary of the First Church. Ralph had been an officer of the First Church in 1971 and 1972. During the years 1969 through 1974, certificates of deposit were purchased at Guaranty Federal Savings and Loan Association of Gainesville, *418 Florida ("Guaranty"), and First Federal Savings and Loan Association of Gadsden County, Florida ("Federal"). At Guaranty these certificates of deposit were represented by 26 accounts and at Federal these certificates of deposit were represented by 19 accounts. Two of the certificates of deposit at Guaranty were in the individual names of W.R. and Minnie and one was in the names of John and Faith. The other certificates of deposit were joint accounts in the names of W.R. and/or Minnie and one or more other persons, primarily W.R. and Minnie's children or grandchildren. W.R. purchased all of the certificates of deposit at Federal. All of the interest income on these accounts was reported as taxable income by joint certificate holders other than W.R. or Minnie. On closing the accounts at Guaranty, W.R. received the proceeds except two checks cashed by John, one representing the proceeds of the account in the names of John and his wife, one check cashed by Dan and four checks cashed by Ralph's children. On closing the accounts at Federal, checks representing the proceeds of 12 accounts were cashed by W.R. or Minnie and one check representing the proceeds of one account was cashed *419 by John. The parties agree that all of the interest income from the certificates of deposit at Federal was forfeited. OPINION We must first consider petitioners' claim that sales of property at Silver Lake Estates, Cooper Lake Hills, Rainbow Lake Estates, Orange Blossom Manor, Lake Lucy Estates, Lake Lucy Shores and Levy County were properly reported as income by John and Dan on their Federal income tax returns. Respondent maintains that the income from these sales must be imputed to W.R. and Minnie. Resolution of this issue is dependent on our determination of who in substance owned the property which was the subject of sales. A taxpayer has a legal right to decrease or avoid taxes by any means which the law permits. Gregory v. Helvering,293 U.S. 465, 469 (1935). Within this context family tax planning is permissible. However, an intra-family transaction will be closely scrutinized; Commissioner v. Culbertson,337 U.S. 733, 746 (1949); Commissioner v. Sunnen,333 U.S. 591, 605 (1948); and the parties' actions must comport with the purported substance of the transaction. Beirne v. Commissioner,52 T.C. 210, 218 (1969). *420 One indication that the transaction in fact does not comport with its purported substance is a lack of formality in execution. Fitz Gibbon v. Commissioner,19 T.C. 78, 86 (1952). In short a taxpayer must "dot his 'i's and cross his 't's" and "cut square corners" when executing an intra-family transaction. As discussed below, petitioners have failed to do so here. A fundamental principal of taxation is that "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). The tax consequences of a transaction are not determined merely by the refinements of title but are determined by actual command over the property taxed. Corliss v. Bowers,281 U.S. 376, 378 (1930). "Command" may be exercised "through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." Griffiths v. Commissioner,308 U.S. 355, 358 (1939). The determination of whether *421 one taxpayer actually sells property or merely acts as a conduit for another taxpayer is a question of fact to be determined by the trial court. United States v. Cumberland Pub. Serv. Co.,338 U.S. 451, 456 (1950). Special scrutiny will be given to intra-family transfers or assignments to avoid deflection of the incidence of taxation away from the taxpayer who actually receives the benefits of the transaction. Commissioner v. Sunnen,supra at 605. Where the Commissioner in his notice of deficiency has determined that the petitioner actually sold the property in question, the burden of proving that another party should be taxed is on the petitioner. Rule 142(a). Here, petitioners have not met their burden of proving that the sales at issue were made by John and Dan and not by W.R. and Minnie. First, it is apparent that John and Dan never actually supplied sufficient consideration for the conveyances. The Florida documentary stamps on the recorded deeds evidencing the conveyance of Silver Lake Estates, Cooper Lake Hills and Rainbow Lake Estates to John and Dan indicate that John and Dan received these properties for minimal consideration. Although *422 W.R., John and Dan testified that John and Dan borrowed the amounts of $50,000 for Silver Lake Estates and $100,000 for both Cooper Lake Hills and Rainbow Lake Estates and submitted what purported to be cancelled notes in the same denominations, we do not find their testimony or documentation to be credible. [16] We note that these obligations were not produced when requested during the audit of the Federal income tax returns of the Royster family. We also note that the purported purchase price for Silver Lake Estates was approximately $100,000 less than the price offered to a third party four years earlier for substantially the same property. In addition neither W.R. nor his sons explained why they would violate Florida law by attaching minimum documentary stamps indicating consideration of less than $100 for each of the three properties when the purported consideration for these properties was $150,000. [17] There is no evidence of any consideration paid by John and Dan to acquire Orange Blossom, Lake Lucy Estates and Lake Lucy Shores except the unsubstantiated testimony of W.R., John and Dan that these subdivisions were acquired as payment for work which John and Dan did when *423 they were 14 and 12, respectively, and as a result of a trade for another subdivision interest. We have found as a fact that the testimony of these witnesses is not credible. Although legal title to the Levy County property was not directly or indirectly conveyed to John and Dan by W.R. and Minnied, W.R. did provide the purchase price for this property. Petitioners do not maintain that any formal indicia of indebtedness was ever executed to evidence the Levy County transaction. Finally, petitioners do not maintain that any of these conveyances were gifts to John and Dan. Second, petitioners submitted purported deeds *424 conveying legal title to enumerated blocks and lots at Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores to John and Dan. These deeds were not recorded. Petitioners argue, and we recognize, that a bona fida unrecorded deed is valid as between the parties under Florida law. Black v. Skinner Mfg. Co.,53 Fla. 1090, 43 So. 919 (1907). However, the failure to record the deeds enabled W.R. and Minnie to continue to deal with the properties as their own and is additional evidence of the lack of genuineness of the conveyances.[18]
Third, it is apparent that W.R. and Minnie were actively involved in soliciting and negotiating sales of the property which was purportedly owned by John and Dan, preparing documents evidencing the transfer of the properties and other activities relating to the properties. Petitioners, in fact, did not specifically identify any sales of individual subdivision lots actually negotiated by John or Dan. In addition John testified that purchasers of individual subdivision lots themselves computed monthly interest payments and that he and Dan did not *425 compute a schedule of payment amounts due. We simply cannot believe that a bona fide seller would conduct business on this basis. We also note that Minnie wrote a letter to James M. Gasser who purchased a lot at Silver Lake Estates informing him that her records indicated interest due to the date of the letter was $112.70. Fourth, W.R. and Minnie claimed that they owned some of the properties at issue subsequent to the purported transfers to John and Dan. W.R. and Minnie filed a petition for writ of mandamus relating to Orange Blossom Manor stating that they were the owners of the Orange Blossom Manor subdivision property purportedly conveyed to John and Dan. In addition W.R. and Minnie entered into an option agreement with Colletti relating to Rainbow Lake Estates, Lake Lucy Estates, Lake Lucy Shores and Orange Blossom Manor which specifically stated that W.R. and Minnie were legal title holders and had the authority to execute the option agreement. Pursuant to this agreement lots at Rainbow Lake Estates were conveyed to Paradise Investment Corp., Colletti's wholly owned corporation. W.R. and Minnie also entered into an option agreement with Caserta relating to Orange Blossom *426 Manor, Lake Lucy Estates and Lake Lucy Shores. Pursuant to this agreement lots in all three subdivisions were conveyed to Caserta. Finally, W.R. and Minnie claimed a charitable contribution deduction for transfers of property purportedly owned by John and Dan to Warner Southern College. The most persuasive evidence, however, is the fact that W.R. and and Minnie apparently never relinquished control over the payments to be made by the purchasers of the properties purportedly owned by John and Dan. On the sales of individual subdivision lots, most of the agreements for deed provided that all payments were to be made to John and Dan or John alone at Box 201, Interlachen, Florida. This was the home address listed on W.R. and Minnie's Federal income tax returns for 1970 through 1973. For a period of at least 13 months during which sales of individual subdivision lots were made, payments were deposited in a joint bank account in the names of W.R., Minnie, John and Dan. There is no indication that the proceeds of the sales were deposited in any other account during this period. This account appears to have been used as the personal checking account of W.R. and Minnie, and the only *427 persons signing checks written during the period in which the account was open were W.R. and Minnie. Petitioners did not produce any evidence that the arrangement was different in other periods except their own self-serving statements. In addition W.R. directed Warner Southern College to make payments for lots that it purchased in Cooper Lake Hills to John and Dan. Two of the four payment checks issued, or $9,200 out of total payments of $13,800, were presented for collection by W.R. Finally, on the sale of the Rainbow Lake Estates lots to Paradise Investment Corp. and the Orange Blossom Manor, Lake Lucy Estates and Lake Lucy Shores lots to Caserta, W.R. and Minnie were the only mortgagees and were to receive all payments on the installment, promissory notes secured by the mortgages. On the sale of the Levy County property, W.R. and Minnie had a one-half interest in the mortgage deed and were to receive one-half of the payments on the installment promissory note secured by the mortgage. The note was payable at W.R.'s residence. It is clear from the above evidence that while legal title to four of the seven properties at issue was obstensibly transferred to John and Dan, in fact *428 W.R. and Minnie had actual command over all of these properties and received the benefits of such command. John and Dan were the subservient agents of a dominant father. There is no doubt as to W.R.'s power over and actual control of his sons. They were manipulated tools of his tax avoidance scheme which was devoid of substance because of W.R.'s continued control of the source of the income. Petitioners' argument that W.R. acted as an agent for the sons is the reverse of the actual situation. W.R. was the principal and the sons were the agents. Likewise, petitioners' contention that they did not have the benefit of legal counsel does not change our conclusion that the property was not in fact owned by John or Dan for Federal income tex purposes. The decision to employ legal counsel to insure that the transactions were properly structured was the choice of petitioners. A reasonable inference to be drawn from petitioners' failure to employ legal counsel is that counsel would have required compliance with the requirements of Federal income tax law, whereas W.R. wished to obstensibly transfer the property while retaining the economic benefits of ownership. Certainly petitioners *429 were aware of the advisability of retaining legal counsel having done so on a number of occasions in relation to their real estate transactions. The only evidence in the record which supports petitioners' claim that W.R. and Minnie did not retain actual command over the property and the economic benefits of such command is the testimony of W.R., John and Dan.Their testimony is simply not credible in light of the evidence in the record. While we believe that John and Dan assisted W.R. in his real estate activities, we conclude that W.R. devised an elaborate scheme obstensibly to transfer property to family members who were in a lower Federal income tax bracket in order to deflect the incidence of taxation away from himself and Minnie and to minimize the possibility that he would be characterized as a dealer in real estate. That petitioners never intended an actual transfer of the properties is amply supported by the absence of consideration for the conveyances, W.R. and Minnie's activities in relation to the properties, John and Dan's failure to record three of the deeds, W.R. and Minnie's statements in relation to the ownership of some of the properties and W.R. and Minnie's control *430 over the proceeds of the sales purportedly made by John and Dan. On the basis of this record, we must sustain respondent's determination that the income from the sales of the property at issue must be imputed to W.R. and Minnie. [19]
We must next consider whether W.R. and Minnie must report interest income from the installment obligations attributable to sales of property which we have imputed to W.R. and Minnie. Petitioners claim that the interest income was properly reported as income by John and Dan on their Federal income tax returns. Respondent maintains that this income must be reported by W.R. and *431 Minnie. We have determined that W.R. and Minnie retained control over the property obstensibly conveyed to John and Dan and controlled the disposition of the proceeds from the sale of this property, including payments on the installment obligations. Consquently, we must sustain respondent's determination that the interest on the installment obligations is properly reported by W.R. and Minnie. We must next consider whether W.R. and Minnie may make an installment sale election under section 453(b)(1)(A) with respect to the sales imputed to them in each of the years 1969 through 1974. This issue was raised for the first time in the original briefs filed by the parties. [20]
Section 1.453-8(b)(1), Income Tax Regs., provides, in pertinent part: A taxpayer who sells or otherwise disposes of real property * * * and who elects to report the income *432 therefrom on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method. The Internal Revenue Service modified its position with respect to the election of the installment method of reporting in Rev. Rul 65-297, 1965-2 C.B. 152. The ruling provides, in pertinent part: In the disposition of cases, if, in good faith, the taxpayer failed to exercise the installment method election to report income from sales of real property and casual sales of personal property on a timely filed original return for the year of sale, the Service will recognize as valid, elections made under the following circumstances: * * * 2. Those cases where election of the installment method was made on an amended return for the year of sale not barred by the statute of limitations or the operation of any other law or rule of law, if the facts indicate no election inconsistent with the installment election had been made with respect to the sale. 3. Those cases where the election had been made on a delinquent *433 return for the year of sale. However, an installment election made after the due date (including extensions thereof) for filing the return for the taxable year of the sale will not be recognized as a valid election if the assessment or collection of any portion of the tax for any taxable year resulting from the application of the installment method to such sale is prevented by the operation of the statute of limitations or of any other law or rule of law. The Fifth Circuit has adopted the election limitation of section 1.453-8(b)(1), Income Tax Regs., as modified by Rev. Rul. 65-297, 1965-2 C.B. 152. Marcello v. Commissioner,380 F.2d 499, 508 (5th Cir. 1967). It is clear in the instant case that W.R. and Minnie are not now entitled to elect installment reporting for gain on sales of property imputed to them. W.R. and Minnie did not report these sales on their Federal income tax returns for any of the years in which the sales were made nor did they file an amended return to otherwise report these sales and make an election to report any gain on the installment method. We have found that W.R. and Minnie's failure to report these transactions was *434 not the result of a good faith omission but of a deliberate attempt to minimize their own tax liability by shifting the tax consequences of certain property sales to John and Dan. Therefore, they do not satisfy the election requirements of the regulation as modified by the revenue ruling. [21] In addition a portion of the gain reported under the installment method will be untaxed if we permit W.R. and Minnie now to elect installment reporting as it appears that some of the installment payments were received in years in which respondent cannot assess any additional tax liability under section 6501(a). This result is specifically prohibited by the revenue ruling. We must next consider petitioners' claim that W.R. and Minnie did not receive taxable income from the sale of Paradise View Estates Addition No. 3 during the years at issue. Apparently, petitioners argue that W. *435 R. and Minnie are entitled to recover their basis in this property prior to reporting any gain on the sale of the property. Generally, the entire amount of gain or loss is recognized in the year the property is sold unless the taxpayer elects to utilize the installment sale provisions of section 453(b). Secs. 1002; 1001(d). However, under the "open transaction" doctrine a taxpayer may recover the basis of property sold prior to reporting any gain where the buyer's "promise of future money payments [are] wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." Burnet v. Logan,283 U.S. 404 413 (1931. Application of the open transaction doctrine is limited to rare and extraordinary circumstances; Estate of Wiggins v. Commissioner,72 T.C. 701, 708 (1979); and requires that neither party nor the property received have a readily ascertainable value. United States v. Davis,370 U.S. 65, 72 (1962). Here, petitioners have demonstrated no reason why W.R. and Minnie should be entitled to open transaction reporting for the sale of the Paradise View Estates Addition No. 3 property. Clearly, *436 the property sold had a readily ascertainable value as determined by the parties to the sale. The payment obligations were absolute in both the agreement with Lackey and with Paradise View Estates, Inc. Lackey made payments of approximately $22,000 prior to October 13, 1969, and Paradise View Estates, Inc., made additional installment payments of at least $15,000 in the years 1969 through 1974. Although W.R. initially testified that he thought that he had reported the gain from this sale on the 1969 Federal income tax return which he and Minnie filed and later testified that this gain was reported in 1971, none of the sales reported on either returns are sufficiently identifiable to support the conclusion that any gain was ever reported. On the basis of this record, we must sustain respondent's determination that W.R. and Minnie had additional income from the sale of Paradise View Estates Addition No. 3 in each of the years at issue. We must next consider petitioners' claim that respondent's determination of the adjusted bases of some of the properties sold is incorrect. Petitioners have the burden of proving that respondent's determinations are incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); *437 Rule 142(a). As a general rule, this Court will not look behind the notice of deficiency to examine the evidence used by respondent in making his determinations. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). The parties have not specifically identified which properties are at issue. [22] Petitioners have made no attempt to calculate what they claim to be the proper bases for the properties but instead merely argue that the assumptions used to calculate the basis amounts in the notice of deficiency were erroneous. The evidence in the record relating to the bases of the properties at issue is inconclusive, and our review of this evidence indicates that any remaining bases attributable to the property sold would, in many cases, be de minimus. [23] We will not, as petitioners suggest, examine the calculations used to support the notice of deficiency considering petitioners' failure to do so and to present any credible evidence in this area. Consequently, we must sustain respondent's determination as to the bases of the properties sold. *438 We must next consider petitioners' claim that income from sales of real estate made by W.R. and Minnie should be capital gain and not ordinary income. Respondent claims that this property was held for sale within the ordinary course of W.R's real estate business and that any income would therefore be ordinary. Section 1221 excludes from the definition of capital assets "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 1221(1). "Primarily" for these purposes means "of first importance" or "principally." Malat v. Riddell,383 U.S. 569, 572 (1966). The question of whether an asset is held primarily for sale to customers in a taxpayer's trade or business is a factual one to be determined on a case-by-case basis. Major Realty Corp. v. Commissioner,749 F.2d 1483, 1488 (11th Cir. 1985). [24] Factors which the courts have used in making this determination are: (1) the natural and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality *439 of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. [United States v. Winthrop,417 F.2d 905, 910 (5th Cir. 1969).] The amount of income generated from property sales and the proportionate share of this income in relation to the taxpayer's other income may also be considered in determining whether the activities constitute a trade or business. See Biedenharn Realty Co., Inc. v. United States,526 F.2d 409, 419 (5th Cir. 1976); United States v. Winthrop,supra at 911. *440 The most important factor in making such a determination is the frequency and substantiality of the taxpayer's sales. Major Realty Corp. and Subs. v. Commissioner,supra at 1488. In most circumstances a pattern of frequent and substantial sales belies the contention that the property is being held for investment. Suburban Realty Co. v. United States,615 F.2d 171, 178 (5th Cir. 1980). However, the fact that a taxpayer holds some property for sale within the ordinary course of business does not preclude a finding that other property is held for investment. See Suburban Realty Co. v. United States,supra at 185. Here, the record demonstrates that W.R. held property for sale in the ordinary course of his business as a dealer in real estate. Although not licensed to sell real estate, W.R. sole numerous properties in the years 1955 through 1974. In addition to the sales purportedly made by John and Dan which we have determined were actually made by W.R. and Minnie, W.R. and Minnie had made sales of or given options to purchase at least 14 separate subdivision properties and reported 40 sales of both improved and unimproved real estate *441 on their Federal income tax returns for the years 1955 through 1973. W.R. and Minnie's income for the years 1955 through 1974 was predominantly attributable to sales of real estate. In each of the years at issue, W.R. and Minnie claimed substantial deductions for nonbusiness and employee business expenses. As the income reported on W.R. and Minnie's Federal income tax returns for these years was predominantly attributable to sales of real estate and other income reported on the returns was from passive sources, we conclude that these expenses relate to the sales of real estate. Both the magnitude of the income generated from sales of real estate and the expenses attributable to such sales indicate that W.R. was a dealer rather than an investor in real estate. The property sold during the years at issue was initially acquired by W.R. and Minnie in the years following their move to Sebring, Florida, in 1954. Some of the property was sold and reacquired by W.R. and Minnie. W.R. stated that all of the property was purchased for investment purposes. W.R. also testified that he had continued to purchase property after his initial acquisition of acreage in Highland County, Florida, *442 because he had made a good profit on the sale of that property and wanted to reinvest the proceeds in other property if he could find a "good buy." We believe that W.R.'s motive for purchasing additional real estate is more consistent with an intent to become a dealer, rather than an investor, in real estate. W.R. and Minnie subdivided some of the properties which they owned. In 1960 W.R. and Minnie platted approximately 38 subdivisions of between 400 and 600 lots each in Putnam County. By 1971 W.R. and Minnie owned approximately 100 subdivision properties in Florida. Although W.R. testified that he only subdivided the property to avoid depreciation in its value as a result of enactment of a new zoning law, this is consistent with holding property as a dealer.The fact that W.R. may have intended to sell property as undivided parcels rather than subdivisions does not preclude characterization as a dealer in real estate. Finally, W.R. and Minnie conducted at least minimal activities in relation to the sale of the real estate. W.R. maintained an office for his real estate activities and conducted business "out of the trunk of his car." In addition W.R. posted signs advertising *443 the sale of lots at one of the properties, dealt with prospective purchasers and drafted documents for the sale of the properties. Some of the properties were advertised in local newspapers. Further, the expenses which W.R. and Minnie reported on their Federal income tax returns clearly indicate that W.R. was involved in activities in relation to the real estate. Finally, John and Dan engaged in at least minor development and construction activity on the properties which were purportedly owned by them. All of the above factors lead us to the conclusion that W.R. was in the business of selling real estate. Although the record does not clearly indicate how significant W.R.'s selling and development efforts were, the frequency and substantiality of the sales made by W.R. and Minnie alone supports respondent's determination that W.R. was a dealer in real estate. Petitioners offer no evidence to the contrary other thatn W.R.'s self-serving testimony that he had "[n]ever been in the real estate business." Having concluded that W.R. was in the business of selling real estate, we must determine whether all of the real estate sales at issue were made within the ordinary course of that *444 business. With the exception of the Levy County property on which John and Dan constructed their personal residences, petitioners have not presented sufficient evidence to show that any of the properties involved herein should be separately characterized as investment property. The portion of the Levy County property on which John and Dan's personal residences were located is clearly more in the nature of property held for investment and gain on the sale of this property would be capital gain and not ordinary income. The property had been held for more than one year at the time of the sale to Oak Ridge Estates, Inc. so that the gain recognized on the sale of this property would be long term capital gain under section 1222(3). Under the rule of Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), we have computed the gain attributable to the residences at the Levy County property to be $17,108.63. The remaining portion of the gain recognized on the sale of the Levy County property to Oak Ridge Estates, Inc. would be ordinary gain. We must next consider whether W.R. and Minnie may deduct amounts paid to John and Dan as ordinary and necessary business expenses *445 under section 162(a) or treat these amounts as capital expenditures under section 263(a). Respondent concedes that any amounts actually paid to John and Dan as compensation for their services in developing or maintaining property owned by W.R. and Minnie would fall within one of these provisions. Generally, if petitioners can establish that some deductible expenditures have been made, absolute certainty is not required and the Court may approximate the allowable deductions "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,supra at 543-544. Here, petitioners have not submitted evidence which would indicate the full amount of payments made to John and Dan in each year, nor have they submitted evidence to indicate how much of the payments would be currently deductible under section 162(a). However, respondent submitted copies of checks drawn on the Dothan Bank and Trust where a joint account was maintained by W.R., Minnie, John and Dan. This account was used exclusively by W.R. and Minnie during the 13 month period in which it was maintained. We find as a fact that the account was actually owned *446 by W.R. and Minnie although obstensibly a joint account with John and Dan and that payments from the account to John and Dan represent compensation to them. On the basis of the transactions in this account and under the rule of Cohan v. Commissioner,supra, we conclude that the compensation paid to John for each of the years 1969 through 1974 is $27,000 per year and the compensation paid to Dan for each of the years 1969 through 1974 is $23,000 per year. These amounts are includible in the gross income of John and Dan under section 61. As the testimony in this case indicates that John and Dan's services in significant part related to maintenance of pre-existing development, these amounts are deductible by W.R. and Minnie under section 162(a). We must next consider whether petitioners are liable for self-employment taxes under section 1401 attributable to income earned by W.R., [25] John and Dan for each of the years at issue. Section 1401 provides, in pertinent part: (a) OLD-AGE, SURVIVORS, and DISABILITY INSURANCE - In addition to other taxes, there shall be imposed for each taxable year, on the self-employment income of every individual, a tax * * * *447 * * * (b) HOSPITAL INSURANCE - In addition to the tax imposed by the preceding subsection, there shall be imposed for each taxable year, on the self-employment income of every individual, a tax * * * "Self-employment income" is defined generally as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business." Secs. 1402(a); 1402(b). The amount of self-employment income subject to the tax is limited to $7,800 in taxable years 1969 through 1971, $9,000 in taxable year 1972, $10,800 in taxable year 1973 and $13,200 in taxable year 1974. Sec. 1402(b)(1). Generally, "employees" are not subject to the imposition of the self-employment taxes. Sec. 1402(c)(2). Here, we have determined that W.R. was in the trade or business of selling real estate. His net income from his real estate activities was in each year in excess of the amount of self-employment income subject to tax. Consequently, *448 we must sustain respondent's determination that W.R. is subject to the maximum amount of self-employment taxes for each of the years at issue. We must also sustain respondent's determination that John and Dan are subject to the maximum amount of self-employment taxes for each of the years at issue. We have determined that John and Dan received $27,000 and $23,000, respectively, in each of the years at issue for the services they provided to W.R. In addition John and Dan have conceded that they had each received additional income in the amounts of $1,128 and $5,269 in taxable years 1972 and 1974, respectively. These amounts are in excess of the amount of self-employment income subject to tax. Petitioners have not shown that these amounts should be reduced by expenses in excess of the amounts reported on their Federal income tax returns for the years at issue nor have they shown that the income was earned through performance of services as employees. We must next consider petitioners' contention that respondent's determination that all of the interest income from enumerated certificates of deposit must be attributed to W.R. and Minnie is in error. Petitioners assert that W. *449 R. and Minnie only supplied the funds for certificates of deposit in their individual names. Petitioners explain that the joint accounts with family members were established for the benefit of the other family members so that each account would be protected under the $10,000 insurance limitation on federally insured bank deposits. Petitioners have submitted five affidavits executed by John, Dan and Ralph, each avering that the funds represented by the certificates of deposit were not attributable to W.R. or Minnie. It is well established that where a taxpayer retains sufficient power and control over assigned property or over the receipt of income he may not escape taxation on the income from the property. Commissioner v. Sunnen,supra at 608. Assignment of the right to income, alone, is not sufficient to avoid the incidence of taxation. Helvering v. Horst,311 U.S. 112, 117 (1940). The evidence in the record controverts petitioners' contention. The only evidence which petitioners have produced in support of their claim is their own self-serving testimony and the statements in the affidavits. In light of the contradictory evidence in the *450 record, we find both the testimony and the affidavits to have no probative value. Petitioners, by stipulation, conceded that the funds used to purchase the certificates of deposit at Federal came from W.R. Respondent maintains that the certificates of deposit at Guaranty likewise were purchased with W.R.'s funds and has introduced an admission by W.R. that he had supplied the funds to purchase these certificates of deposit. Petitioners have not produced any evidence to show that the funds came from persons other than W.R. except for the affidavits and the testimony of W.R., John and Dan. We have determined that this evidence is of no probative value. Of the 26 accounts at Guaranty, W.R. or Minnie received the proceeds on closing most of the accounts and of the 19 accounts at Federal W.R. or Minnie received the proceeds on closing at least 12 of the accounts. Clearly, W.R. and Minnie never intended to alienate or transfer the funds in these accounts and must include the interest attributable to these accounts in their gross income. Although we believe that W.R. and Minnie did intend to alienate or transfer the accounts in which other persons received the proceeds on closing the *451 accounts, this alienation or transfer was not effective for Federal income tax purposes until the other parties received unfettered control over the proceeds of the accounts. With the exception of the account in the name of John and Faith at Guaranty this did not occur until the other parties received the proceeds of the accounts. Prior to closing the accounts W.R. or Minnie or both retained power and control over the funds as they could withdraw the full amount. Consequently, with the exception of the account in the name of John and Faith, W.R. and Minnie must include the interest attributable to these accounts in their gross income. Petitioners further argue, and we agree, that W.R. and Minnie may claim a loss under section 165(a) for the full amount of interest forfeited at Federal. As this is not a trade or business expense, the forfeiture amount would reduce adjusted gross income under section 63(b)(1)(A). [26] Therefore, to the extent that any of the interest income from the certificates of deposit at Federal was forfeited, W.R. and Minnie may claim a loss. *452 We must next consider whether the deductions petitioners claim for charitable contributions are in excess of the amount allowable under section 170. The charitable contributions at issue are the transfer of 100 acres of property in Gilchrist County, Florida, by W.R. and Minnie to the First Church in 1972, and transfers of lots at Cooper Lake Hills and Silver Lake Estates to Warner Southern College during the years 1969 through 1971. We have determined that the Cooper Lake Hills and Silver Lake Estates real estate were actually owned by W.R. and Minnie although legal title to these properties was conveyed to John and Dan. Accordingly, any charitable contribution deduction resulting from these conveyances would be available to W.R. and Minnie alone. Section 170(a)(1) permits an individual taxpayer to deduct amounts paid as a charitable contribution within the taxable year. Where property is the subject of the contribution or gift the amount paid is generally the fair market value of the property at the date of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. However, the amount of any charitable contribution otherwise taken into account will be reduced by the amount of gain *453 which would not be long term capital gain if the property had been sold by the taxpayer at its fair market value. Sec. 170(e)(1)(A). The determination of fair market value is a question of fact to be resolved by consideration and weighing of all relevant evidence in the record. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). In making a determination of fair market value we may rely on the opinion of experts. Palmer v. Commissioner,532 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Estate of Piper v. Commissioner,72 T.C. 1062 (1979). Opinion evidence, however, must be weighed in light of the expert's qualifications and with regard to all other relevant evidence. Anderson v. Commissioner,supra at 249. Here, respondent concedes that the Gilchrist County property was a capital asset for which long term capital gain would be recognized on a sale. However, respondent claims that the fair market value of $150,000 claimed by W.R. and Minnie on their Federal income tax return for 1974 is in excess of the actual *454 fair market value. Respondent did not produce any expert testimony as to the valuation of the property but pointed to the fact that the same property was conveyed to John and Ralph three weeks after the contribution to the First Church for a total purchase price of $20,000. Petitioners assert that the original valuation was correct. Petitioners presented statements by Colletti and Gerald Collier ("Collier") to support their contention. In addition Collier testified as to valuation at the trial of this case. Both Collier and Colletti were real estate brokers, and Collier was a designated appraiser under the American Institute of Appraisers. The testimony and statements of petitioners' "experts" are of doubtful probative value in light of the sale of the property, which was almost contemporaneous with the contribution, for consideration of $130,000 less than the claimed fair market value of the property. Petitioners have offered no explanation as to how the fair market value of the property could decline by this amount in a three week period, and we must sustain respondent's determination as to the fair market value of the Gilchrist County property. [27]
*455 We do not reach the issue of fair market value in the case of the contributions of the Cooper Lake Hills and Silver Lake Estates real estate to Warner Southern College. We have determined that W.R. held this property within the ordinary course of his real estate business. Consequently, any charitable contribution is limited to W.R.'s basis in this property under section 170(e)(1). As we have sustained respondent's determination that W.R. has no basis in this property, W.R. and Minnie are not entitled to a charitable contribution deduction for the donation of the property to Warner Southern College. We must next determine whether petitioners are liable for the addition to the tax under section 6643(a) for each of the years at issue. Respondent's determination that a part of the underpayment for each year was due to negligence is presumptively correct. Magill v. Commissioner,70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981). Petitioners have the burden of proving that they did not negligently or intentionally disregard the rules. Patterson v. Commissioner,740 F.2d 927, 930 (11th Cir. 1984). Petitioners "cannot avoid *456 [their] duty to file accurate returns simply by shifting the responsibility to [their] agents." Enoch v. Commissioner,57 T.C. 781, 802 (1972). Where petitioners rely on the advice of an agent, they must show that they supplied the correct information to the agent. Enoch v. Commissioner,supra at 803. Petitioners maintain that the underpayments at issue were not due to negligence. The Federal income tax returns for each year at issue were prepared by an accountant. Glenn Stephens prepared most of these returns from information supplied by W.R. Petitioners do not assert that the accountants incorrectly reported the information given to them. Instead they claim that W.R. maintained adequate records which are unavailable without fault on the part of petitioners. In this case the fact that petitioners may have maintained records is not determinative. The record amply supports a finding that W.R. and other family members deliberately attempted to minimize the family's total tax liability through a series of transfers designed to conceal the true ownership of real estate obstensibly held by family members other than W.R. or Minnie. [28] *457 Although W.R. did not have an extensive formal education, he was apparently highly successful in the real estate business and was certainly sophisticated enough to recognize that a transfer without any substance should not effect the tax consequences to the parties. On the basis of this record, we find that petitioners have not met their burden of proving that respondent erred as to the additions to the tax for negligence, and we must sustain respondent's determinations. We must next determine if W.R. and Minnie are entitled to the benefits of computing their tax for the taxable years *458 at issue under the income averaging provisions of sections 1301 through 1305. Initially, we note that the parties could have assisted us in our determination of the income averaging issue through the use of stipulations and admonish the parties that our rules require stipulations to the fullest extent possible. Rule 91(a)(1). W.R. and Minnie made an election to use the income averaging provisions for the years 1970 thorugh 1974 but did not elect these provisions in 1969. However, W.R. and Minnie did raise the availability of income averaging for all years at issue in their petition. Our decision in Hosking v. Commissioner,62 T.C. 635 (1974) permits an election to income average to be made for the first time "while the year involved is still open to adjustment." Hosking v. Commissioner,supra at 641. The opinion in Hosking v. Commissioner,supra, was clarified in Cloes v. Commissioner,79 T.C. 933 (1982). In that case taxpayers raised the availability of income averaging for the first time in connection with a Rule 155 computation. We denied taxpayers' claim that they were entitled to use the income *459 averaging provisions holding that income averaging was a new issue which could not be raised for the first time in a Rule 155 proceeding. Cloes v. Commissioner,supra at 935. The Court distinguished the situation in Hosking v. Commissioner,supra, stating that in Hosking only the timeliness of the election made at trial was at issue and that all of the facts necessary to determine the income for each base period vear were know. Cloes v. Commissioner,supra at 936. In order to benefit from the limitation on the tax imposed under section 1301, the taxpayer must show that he meets certain computational requirements determined by applying a statutorily mandated formula to his averagable income. Sec. 1301. Averagable income is again defined by a statutorily mandated formula using as its base the taxable income for the four years preceeding the computation year, with adjustments, each year defined as a "base period year." Sec. 1302. Critical to determining whether sufficient information exists to compute the tax imposed under section 1301 is a determination of the amount of Federal taxable income for the four years *460 preceeding the year for which the computation is made. Here, there is sufficient evidence in the record to make such a determination. We have already made a determination as to the components of base period income for the years 1969 through 1973. Petitioners have submitted their Federal income tax returns for the years 1965 through 1968, the other base period years at issue. A substantial portion of the income reported on these Federal income tax returns was attributable to sales of real estate. W.R. and Minnie reported these sales as capital transactions. However, as we have determined that W.R. was a dealer in real estate and petitioners have not produced evidence that any of these properties were held for investment, the income reflected on W.R. and Minnie's returns for the base period years 1965 through 1968 must be redetermined to reflect these sales as ordinary transaction. We find that the adjusted basis of the properties sold and other items reported by W.R. and Minnie for these years should be computed as reported. Cohan v. Commissioner,supra.
On the basis of this record, we find that W.R. and Minnie's tax liability for the years at issue should *461 be computed using any benefits provided by the provisions of sections 1301 through 1305. However, such computations must reflect the adjustments made to the income of the base period years as determined in this opinion. Finally we find it necessary and appropriate to comment on the conduct of petitioners' counsel, Joseph E. Warren. Mr. Warren consistently failed to submit his briefs on the due dates and requested extensions of time to file his briefs by telephonic means and otherwise. The grounds submitted by Mr. Warrent for cause to extend were, in our opinion, flimsy and for the most part without merit. Mr. Warren's conduct was particularly egregious with respect to the reply brief. Mr. Warren was notified that his reply brief was due on March 19, 1984. On the afternoon of March 19, 1984, Mr. Warren orally requested an extension of the filing date. Although we permitted Mr. Warren to file an untimely reply brief, we caution Mr. Warren and other counsel that such dilatory behavior will not be sanctioned in the future. We note that this Court has recently dismissed a case under Rule 123(b) when petitioners' counsel failed to file a brief as directed by the Court. Stringer *462 v. Commissioner, 84 T.C.     (April 15, 1985). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: W. R. Royster and Minnie M. Royster, Docket No. 2366-79; John E. Royster and Faith S. Royster, Docket No. 2367-79; Dan Earl Royster and Dale T. Royster, Docket No. 2368-79.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Faith S. Royster and Dale T. Royster are parties primarily because they signed joint Federal income tax returns with their husbands, John E. Royster and Dan Earl Royster respectively. Consequently, where appropriate, reference to John E. Royster and Dan Earl Royster shall include their wives.↩
4. Although not entirely clear from the record, it appears that in addition to the agreement reached by the parties on the amount of charitable contributions, other than contributions of land, made by W.R. and Minnie, petitioners have conceded additional issues raised in the petitions. These issues are the allocation of certain interest payments reported on John and Dan's Federal income tax returns to principal, the deductibility of additional charitable contributions on John and Dan's Federal income tax returns and the inclusion of additional compensation income in John and Dan's gross income for 1972 and 1974. In any event petitioners have not presented sufficient evidence on these issues and have therefore failed to meet their burden of proof. Welch v. Helvering,290 U.S. 111, 115↩ (1933); Rule 142(a).
5. The parties presented no evidence that either W.R. or Minnie was an employee during any of these years.↩
6. Some of these expenses were reduced for personal usage.↩
7. Unless otherwise designated all of the property subject to the original conveyance to W.R. and Minnie shall be referred to as Silver Lake Estates. ↩
8. Florida documentary stamps required on deeds transferring an interest in realty were $ .10 per $100 of consideration prior to 1957, $ .20 per $100 of consideration from 1957 through 1962, and $ .30 per $100 of consideration from 1963 through 1978. Fla. Stat. sec. 201.02↩ (1931), as revised.
9. Unless otherwise designated all of the property subject to the original transfer to W. R. and Minnie shall be referred to as Cooper Lake Hills.↩
10. Unless otherwise designated all of the property subject to the original conveyance to W. R. and Minnie shall be referred to as Rainbow Lake Estates. ↩
11. An earlier option agreement relating to the property conveyed by warranty deed on February 28, 1959, recited that total consideration for the transfer would be $2,500. However, the record contains no evidence that any amount in excess of $1,900 was paid.↩
12. The combined selling price for the two properties was $84,455, the total of the option price of Rainbow Lake Estates and the second property.↩
13. Although there is a discrepancy in the $134,100 consideration paid for Rainbow Lake Estates as indicated by the Florida documentary stamps affixed to the deed and the mortgage amount, we note that the payments required for the release of all of the lots at Rainbow Lake Estates would be $134,100. There is no indication that John or Dan would receive the excess over the amount of the promissory note and downpayment.↩
14. Unless otherwise designated all of the property subject to the original conveyance shall be referred to as Orange Blossom Manor, Lake Lucy Estates or Lake Lucy Shores.↩
15. The Paradise View Estates Addition No. 3 property comprised only a small portion of the property subject to the original transfer to W.R. and Minnie.↩
16. In several instances W.R.'s testimony was contradicted by evidence in the record. For example, W.R. testified that the joint checking account at the Dothan Bank and Trust in the names of W.R., Minnie, John and Dan was closed shortly after it was opened. However, the evidence in the record shows that this account was maintained for 13 months. ↩
17. Under Florida statutes, making, signing or issuing any instrument without the full amount of tax thereon being fully paid is a misdemeanor. Fla. Stat. sec. 201.17↩ (1931), as revised.
18. See Horstmier v. Commissioner,T.C. Memo. 1983-409↩, n. 19.
19. To the extent that these sales are also reflected in the taxable income of John or Dan during the years at issue the sales must be eliminated in computing the tax liability for John and Dan. Respondent also determined that the income from the sales of property at issue should be allocated to W.R. and Minnie pursuant to sec. 482. Respondent abandoned this argument on brief. As we have determined that W.R. and Minnie are taxable on this income because they never relinquished command over the property sold, we have not further considered the application of sec. 482.↩
20. As a general rule this Court will not consider issues which have not been properly pleaded. Markwardt v. Commissioner,64 T.C. 989, 997↩ (1975). However, we decline to apply this prohibition here as the parties have fully set forth their respective positions on brief without objection to consideration of this issue.
21. Although in unusual circumstances we have permitted a petitioner to raise the availability of an untimely election where no amended return was filed and the omission was in good faith, such circumstances do not exist here. See Estate of Broadhead v. Commissioner,T.C. Memo. 1972-195↩.
22. We note that respondent's calculation of the gain from the sale of the Levy County property to Oak Ridge Estates, Inc. was identical to the gain from that transaction reported on John and Dan's Federal income tax returns for the years 1969 through 1973. Consequently, we assume that petitioners do not dispute respondent's determination of the adjusted basis of the Levy County property. ↩
23. The parties did submit deeds and plats of the various properties from which it might be possible to calculate the bases of the properties after extensive review of these documents. We have cautioned petitioners in the past that we will not serve as their accountants; Winter v. Commissioner,T.C. Memo. 1983-118↩; and we add that we will not engage in extensive research of title transfers.
24. The Eleventh Circuit in Major Realty Corp. v. Commissioner,749 F.2d 1483 (11th Cir. 1985) did not specifically adopt the three factor analysis of Suburban Realty Co. v. United States,615 F.2d 171, 178 (5th Cir. 1980). The Fifth Circuit in Suburban Realty Co. v. United States,supra, stated that the principal inquiry demanded by sec. 1221(1) is: 1) was taxpayer engaged in a trade or business, and, if so, what business? 2) was taxpayer holding the property primarily for sale in that business? 3) were the sales contemplated by taxpayer "ordinary" in the course of that business? [Footnote ref. omitted; Suburban Realty Co. v. United States,supra at 178.] Although we have not separately enumerated the evidence which would underlie a determination under the three factor test of Suburban Realty Co. v. United States,supra,↩ the evidence in the record supports the conclusion that W.R. was in the trade or business of selling real estate, that most of the property at issue was held for sale in that business and that most of the sales were ordinary within that business.
25. Although Minnie assisted her husband in business operations, respondent did not determine that she had any self-employment income subject to tax under sec. 1401.↩
26. This is consistent with the Commissioner's analysis in Rev. Rul. 73-511, 1973-2 C.B. 402↩.
27. Respondent did not argue that the contribution to the First Church was a disguised cash payment in the amount of $20,000 although this would be an alternative ground for sustaining respondent's determination.↩
28. This conclusion is supported by W.R.'s disclosures to Robert Sperow who testified as follows: Q. Did Mr. Royster ever have any conversations with you about how he operated his business? A. Yes. Q. Do you recall what those conversations consisted of? A. I do know that he said occasionally he would have payments made to his boys, especially Johnny and [Dan] that are here today. Q. Did he ever say to you why--did he ever say to you that he owned property and yet would have payments made to the boys? A. Yes. Q. Did he say why he did that? A. Well, to keep down taxes.↩